[Cite as *State v. Brady*, 2014-Ohio-5721.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | CASE NO. 13 MA 88 |
| V. | ) | |
| | ) | OPINION |
| ERIC BRADY, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:   Criminal Appeal from Court of Common
Pleas of Mahoning County, Ohio
Case No. 2010CR851

JUDGMENT:   Affirmed

APPEARANCES:
For Plaintiff-Appellee   Paul Gains
Prosecutor
Ralph M. Rivera
Assistant Prosecutor
21 W. Boardman St., 6th Floor
Youngstown, Ohio 44503

For Defendant-Appellant   Attorney Rhys B. Cartwright-Jones
42 N. Phelps St.
Youngstown, Ohio 44503-1130

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated: December 26, 2014

DONOFRIO, J.

**{¶1}** Defendant-appellant Eric Brady appeals from his conviction entered in the Mahoning County Common Pleas Court for one count of vehicular homicide following a jury trial. He contends his conviction was not supported by sufficient evidence and was against the manifest weight of the evidence, and that the trial court erred in allowing into evidence a scientifically unreliable conclusion as to the speed, direction of travel, and cause of impact.

**{¶2}** On January 18, 2009, shortly after 7:00 a.m., Terrance Grey heard a loud crash while drinking coffee in his home. (Trial Tr., Vol. II, 218.) Grey looked out his window and observed that two vehicles had been involved in a traffic accident on Meridian Road in Youngstown, Ohio. (Trial Tr., Vol. II, 217-219.) The two vehicles were a green Ford Explorer and a tan Pontiac Sunfire. Grey then called 911. (Trial Tr., Vol. II, 220.) Grey testified that he observed Brady walking around near the accident. He saw Brady walk over to the vehicle, look inside and then return to his vehicle where it appeared as if he was looking for something in the backseat. (Trial Tr. Vol. II, 221.) Grey described Brady as "walking around like he was dazed and probably confused or something." (Trial Tr., Vol. II, 222.)

**{¶3}** Christopher Burton heading northbound on Meridian Road towards Mahoning Avenue stopped at the scene when he came across the accident. (Trial Tr. Vol. II, 232.) When asked about the conditions of the road, Burton stated, "I drive a four-wheel drive, and I know I was coming off the road, off of my street, and seen that it had just snowed because there was no track marks on Meridian when I came down." (Trial Tr., Vol. II, 237-238.) When he arrived, he observed Brady talking to another person in a white pickup truck. The driver of the white pickup truck is now deceased and was unable to testify on what was exchanged between himself and Brady.

**{¶4}** Burton described Brady as "upset, frantic * * * [h]is arms were going." (Trial Tr., Vol. II, 245.) Burton then saw Brady walk across the street over to the parking lot of B & R Wholesale Tires. (Trial Tr., Vol. II, 234.) Meanwhile, Burton

noticed that the driver of the other vehicle was still inside her automobile. (Trial Tr. Vol. II, 235.)

**{¶5}** At this time, Youngstown Police had arrived at the scene. Youngstown Officer Daniel Mikus was the first to respond to the accident. (Trial Tr., Vol. II, 250.) Mikus described the conditions as "extremely hazardous that day" due to the heavy snowfall that morning. (Trial Tr., Vol. II, 251.) Mikus stated that he was unable to drive the posted speed limit of 35 m.p.h because of the snowfall. (Trial Tr., Vol II, 251.) When Mikus approached the tan Pontiac Sunfire, he observed that the driver was deceased. (Trial Tr., Vol. II, 252.)

**{¶6}** At this time, Officer Mikus observed footprints in the snow in the direction of B & R Wholesale Tire. (Trial Tr., Vol. II, 255.) When Mikus followed the footprints, he found Brady lying on the ground behind a dumpster. (Trial Tr., Vol. II, 256.)

**{¶7}** Also responding to the scene that morning was Youngstown Lieutenant William Ross. Lieutenant Ross also testified that he found Brady lying behind a dumpster near B & R Wholesale Tires. (Trial Tr., Vol. II, 333.) Brady claimed that he was looking for his son, who he believed was in the vehicle with him. (Trial Tr., Vol. II, 333-334.) At this time, Brady admitted to driving the Ford Explorer that had been involved in the crash. (Trial Tr., Vol. II, 334.) Ross testified that no child was found at the scene that morning. (Trial Tr., Vol. II, 334.)

**{¶8}** Shortly before 8:00 a.m. that morning, Youngstown Officer Brian Booksing, assigned to the accident investigation unit, responded to the accident. (Trial Tr., Vol. II, 266-269.) Booksing observed that the Sunfire sustained "excessive damage" to the driver's side, and the Ford Explorer sustained "significant damage" to the driver's side. (Trial Tr., Vol. II, 276.) Booksing described the road conditions as "snowy, slush covered roadways with ice in patches." (Trial Tr., Vol. II, 284.)

**{¶9}** Upon observing the evidence at the scene, Booksing concluded that the Sunfire was traveling northbound in the curb lane, and the Ford Explorer was traveling southbound. (Trial Tr., Vol. II, 290-291.) While traveling southbound, the

Ford Explorer "had come left of center, crossing the one northbound lane and striking the Pontiac Sunfire in its own travel lane." (Trial Tr., Vol. II, 290-291.)

{¶10} While conducting an investigation into the accident, Booksing measured the tread depth on all four tires of Brady's Ford Explorer. (Trial Tr., Vol. II, 296.) Officer Booksing testified a new tire measured four thirty-seconds of an inch. (Trial Tr., Vol. II, 299.) The tire treads of Brady's Ford Explorer, measured zero thirty-seconds and one thirty-seconds of an inch. (Trial Tr., Vol. II, 299.) The tire tread on the Brady's Ford Explorer was described by Booksing as "unsafe." (Trial Tr. Vol., Vol. II, 310).

{¶11} When Booksing spoke to Brady about the accident a few days later, Brady claimed that he did not remember any of the events that took place that day. (Trial Tr., Vol. II, 294.)

{¶12} Also assigned to investigate the accident was Youngstown Detective Sergeant Patricia Garcar. (Trial Tr., Vol. II, 349.) Garcar stated that she observed significant damage to the Sunfire's A-pillar. (Trial Tr., Vol. III, 356-357.) She explained that a vehicle's pillars "are probably the most -- the strongest parts of the vehicle, one of the strongest parts of the vehicle." (Trial Tr., Vol. III, 356.)

{¶13} Garcar also examined the tire tread of Brady's vehicle. She described the tires as "[s]mooth as a baby's bottom." (Trial Tr., Vol. III, 358.) She discovered "[v]ery little, if any, tread on his car, on the Explorer." (Trial Tr., Vol. III, 358-359.)

{¶14} Additionally, Garcar explained that "the Sunfire was traveling northbound in the curb lane. Basically, the green vehicle crosses and crosses her lane. That first impact was a side -- kind of sideswiping impact * * *." (Trial Tr., Vol. III, 365.) She testified that the first point of contact would have been the driver's front-side fender. (Trial Tr., Vol. III, 366.) Further, Garcar stated that Brady's vehicle crossed the center line and struck decedent's vehicle in the curb lane. (Trial Tr., Vol. III, 368-369.)

{¶15} The posted speed limit on Meridian Road is 35 m.p.h. Garcar stated that Brady's vehicle was "definitely" traveling in excess of 35 m.p.h. based on her

assessment of the damage to the vehicles. (Trial Tr., Vol. III, 370-371.) During cross-examination, Garcar testified that Brady was likely traveling between 40 and 50 m.p.h. (Trial Tr., Vol. III, 392-393.)

**{¶16}** Also testifying about the data module recovered from decedent's Sunfire was Ohio State Highway Patrol Trooper Christopher Jester. (Trial Tr., Vol. III, 426.) Jester is a crash reconstructionist for Northeast Ohio. Jester stated that decedent was traveling 42 m.p.h., five, four, and three seconds before the airbag deployed. (Trial Tr., Vol. III, 431-432.) Further, he stated she was traveling 35 m.p.h. at two seconds prior to deployment, and 29 m.p.h. at one second before deployment. (Trial Tr., Vol. III, 432.)

**{¶17}** In an autopsy report prepared by Dr. Joseph Ohr he stated that the decedent died on January 18, 2009, as a result of blunt impacts to head, trunk, and extremities with vascular, skeletal and visceral injuries. (Trial Tr., Vol. III, 407.)

**{¶18}** Brady was transferred from the scene of the accident to a hospital by ambulance where a blood sample was taken for purposes of determining alcohol or drug use (Trial Tr., Vol. II, 318.) The results of the blood test indicated that Brady did not have any alcohol or drugs in his system at the time of the accident. (Trial Tr., Vol. II, 319.)

**{¶19}** A Mahoning County grand jury indicted Brady on August 26, 2010, for two counts related to the crash. Count one was for failure to stop at an accident in violation of R.C. 4549.02(A)(B), a third-degree felony. Count two was for aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(B)(3), a third-degree felony.

**{¶20}** On April 26, 2013, the jury found Brady not guilty on both counts but on the second count found Brady guilty of the lesser-included offense of vehicular homicide, in violation of R.C. 2903.06(A)(3)(a)(C), a first-degree misdemeanor. (Trial Tr., Vol. III, 491-492.)

**{¶21}** The trial court conducted Brady's sentencing hearing on April 29, 2013. At the time of sentencing, Brady was currently serving a five-year prison sentence for robbery. (Sentencing Tr., 5.) The court sentenced Brady to a six-month term of

incarceration. The court recognized that Brady had already served the six months, and any remaining time by law must run concurrently with the sentence he is already serving. (Sentencing Tr., 11.) Further, the court suspended Brady's driver's license for a period of five years. As a result, the trial court sentenced Brady to one-hundred and eighty days already served. This appeal followed.

{¶22} Brady raises two assignments of error. In his first assignment of error, Brady argues:

THE TRIAL COURT ERRED IN ENTERING A CONVICTION WITHOUT THE SUPPORT OF SUFFICIENT EVIDENCE AND/OR AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶23} Sufficiency of the evidence deals with legal adequacy rather than the weight or persuasiveness of the evidence. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In viewing a sufficiency of the evidence argument, we evaluate the evidence in the light most favorable to the prosecution. *State v. Goff*, 82 Ohio St.3d 123, 138, 694 N.E.2d 916 (1998). A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines that no rational juror could have found that the elements of the offense were proven beyond a reasonable doubt. *Id.*

{¶24} Weight of the evidence deals with the inclination of the greater amount of credible evidence to support one side of the issue over the other. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. In reviewing a manifest weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Id.* A reversal on weight of the evidence is ordered only in exceptional circumstances. *Id.* In fact, where a criminal case has been tried by a jury, only a unanimous appellate court can reverse on the ground that the verdict was

against the manifest weight of the evidence. *Id.* at 389, 678 N.E.2d 541, citing Section 3(B)(3), Article IV of the Ohio Constitution (and noting that the power of the court of appeals is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses).

**{¶25}** In conducting our review, we proceed under the theory that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125 (7th Dist.1999). Rather, we defer to the jury who was best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, and gestures of the witnesses testifying before it, including appellant himself. *Seasons Coal Co. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1994); *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967).

**{¶26}** Lastly, in a case such as this where sufficiency and weight of the evidence are argued together, we recognize that "a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." *State v. Gravely,* 188 Ohio App.3d 825, 840-41 (10th Dist.2010), citing *State v. Braxton*, 10th Dist. No. 04AP-725, 2005 Ohio 2198.

**{¶27}** Brady was convicted of vehicular homicide in violation of R.C. 2903.06(A)(3)(a)(C), a first-degree misdemeanor, which essentially provides that no person, while operating or participating in the operation of a motor vehicle shall negligently cause the death of another. R.C. 2901.22, which defines the various culpable mental states, defines negligently as follows:

> A person acts negligently when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that his conduct may cause a certain result or may be of a certain nature. A person is negligent with respect to circumstances when, because of a substantial lapse from due care, he fails to perceive or avoid a risk that such circumstances may exist.

R.C. 2901.22(D).

**{¶28}** Under R.C. 2901.22(D), something more than ordinary negligence is required to prove criminal negligence. There must be a substantial lapse from due care. *State v. Dailey*, 5th Dist. No. 2006-CA-0012, 2007-Ohio-2544, ¶ 19. Specific to vehicular homicide, the Sixth District affirmed a conviction for vehicular homicide after it concluded that the defendant's excessive speed constituted a substantial lapse of due care. *See State v. Whitmaker*, 111 Ohio App.3d 608, 613, 676 N.E.2d 1189 (6th Dist.1996).

**{¶29}** Further, "[t]he determination of whether a lapse of due care is substantial is a question for the trier of fact." *State v. Self*, 112 Ohio App.3d 688, 693, 679 N.E.2d 1173 (12th Dist.1996). Moreover, "substantial" is another word for "material," which means "being of real importance or great consequence." *Id.*

**{¶30}** *Whitmaker*, relied upon by the state, supports the conclusion that Brady's excessive speed in the wintery conditions constituted a substantial lack of due care. In *Whitmaker*, the accident occurred on a clear sunny day when an eyewitness estimated that defendant was traveling between 12 and 25 m.p.h over the posted 45 m.p.h speed limit. *Whitmaker* at 610. Similarly, a responding officer estimated the defendant's speed at 60 m.p.h. *Id.* However, a physics professor estimated the defendant's speed between 73 and 83 m.p.h shortly before he started to break, which slowed to between 57 m.p.h and 63 m.p.h at impact. *Id.* at 610-611. The Sixth District found that the evidence supported that the defendant negligently caused the death. *Id.* at 613.

**{¶31}** This court recognized that merely driving below the posted speed limit does not in and of itself mean that the driver is not driving recklessly. *State v. Monigold*, 7th Dist. No. 03 CO 25, 2004-Ohio-1554, ¶ 15; *see also State v. Howell*, 137 Ohio App.3d 804, 815, 739 N.E.2d 1219 (11th Dist. 000), citing R.C. 2901.22(E) (stating that "criminally negligent conduct is necessarily subsumed by reckless behavior.").

**{¶32}** This court stated that even driving at the posted speed limit during a winter storm could constitute recklessness:

> Speed limits permit a driver to operate their car up to a certain speed, however, that does not mean in all conditions it is safe to travel at the speed limit. For example, the speed on many highways is 65 mph and it is safe to travel at that speed when the road conditions are good. However, during a winter storm that causes the roads to be extremely icy, it is not safe to travel 65 mph. If a person does decide to travel at that speed, even though they are continually sliding across the road, and causes an accident, they may be acting with heedless indifference to a known risk.

*Monigold* at ¶ 15.

**{¶33}** As indicated, even if a person is driving under the posted speed limit it does not mean that a person is not driving negligently. Moreover, speed limits permit a driver to operate their vehicle up to a certain speed; however, that does not mean in all conditions it is safe to travel at that speed limit. Here, the posted speed limit was 35 m.p.h. There is not unequivocal evidence presented that Brady was in fact driving above the posted speed limit at the time of the collision. However, the conditions of the roads were "extremely hazardous that day." During a recent snowfall, it may not be safe to travel at a posted speed of 35 m.p.h. If a person does decide to travel at that speed, even though their car may slide across lanes, and causes an accident, they may be acting with heedless indifference to a known risk.

**{¶34}** Moreover, in the present case, Brady points to no specific evidence in the record to establish that the jury lost its way in assessing the evidence of this case. Rather, the state presented two different witnesses, crash investigation testimony by the police, in addition to an accident reconstructionist to establish that Brady had committed a substantial lapse of due care by failing to perceive the risk of driving on snowy, icy roads over the speed limit on bad tires. The evidence admitted

at trial concerning Brady's speed, the road conditions and the vehicles tire tread, would convince the reasonable trier of fact of Brady's guilt beyond a reasonable doubt.

**{¶35}** Among the witnesses called by the state at trial was Detective Garcar, who is trained in accident reconstruction. Garcar concluded in her investigation that the collision occurred when Brady's vehicle crossed the center line and struck the decedent's vehicle in the curb lane. Garcar also testified that Brady was "definitely" traveling in excess of the posted 35 m.p.h speed limit. Additionally, the state also called Officer Booksing, also trained in crash accident reconstruction. Booksing testified about the tire tread depth on the tires of Brady's vehicle. Booksing described the tire tread on the Brady's vehicle as "unsafe."

**{¶36}** Finally, our conclusion that Brady's conviction is supported by the manifest weight of the evidence is dispositive of Brady's sufficiency claim. Therefore, based on the resolution of Brady's manifest weight argument, the state presented sufficient evidence that Brady negligently caused decedent's death. As stated above, the evidence presented by the state of the conditions which existed at the time of the accident and the circumstances under which the accident occurred is sufficient to support a finding of criminal negligence beyond a reasonable doubt. Thus, Brady's conviction for vehicular homicide was supported by sufficient evidence.

**{¶37}** For the reasons stated above, Brady's first assignment of error is without merit.

**{¶38}** In his second assignment of error, Brady argues:

THE TRIAL COURT ERRED IN ALLOWING IN SCIENTIFICALLY UNRELIABLE CONCLUSION AS TO SPEED, DIRECTION OF TRAVEL, AND CAUSE OF IMPACT.

**{¶39}** Under this assignment of error, Brady argues that the trial court abused its discretion in allowing Youngstown Detective Sergeant Patricia Garcar to render her opinion concerning the cause of the accident; particularly, the speed of Brady's

vehicle. Brady does not take issue with Officer Brian Booksing's testimony concerning his investigation of the accident.

**{¶40}** The central issue is whether a properly trained and experienced officer may estimate a vehicle's speed without independent verification based upon the damage sustained to the vehicles involved and the totality of the evidence gathered at the scene. A trial judge has a special obligation to ensure that scientific testimony is not only relevant but reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 118. However, a trial court's ruling on the admissibility of an expert's testimony is within its broad discretion and will not be disturbed absent an abuse of discretion. *State v. DeWalt*, 7th Dist. No. 06 CA 835, 2007-Ohio-5248, ¶ 7, citing *State v. Jones*, 90 Ohio St.3d 403, 414, 739 N.E.2d 300 (2000). The term abuse of discretion is more than an error of law or judgment; it indicates that the court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

**{¶41}** Evid.R. 702 governs the admission of expert testimony, and states in part:

> A witness may testify as an expert if all of the following apply:
>
> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
>
> (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

**{¶42}** It has been held that a prospective witness does not have to be the best witness on the topic to qualify as an expert. *Alexander v. Mt. Carmel Medical Center*,

56 Ohio St.2d 155, 159, 383 N.E.2d 564 (1978). Instead, a potential expert must demonstrate knowledge greater than that possessed by an average juror. *State Auto Mut. Ins. Co. v. Chrysler Corp.*, 36 Ohio St.2d 151, 160, 304 N.E.2d 891 (1973).

{¶43} Specific to traffic accidents, "Ohio courts have held that a witness who testifies about the cause of an accident must have knowledge concerning, or experience in determining the cause of accidents." *Kolidaski v. Glenn McClendor Trucking Co.,* 7th Dist. No. 03 MA 64, 2004-Ohio-3638, ¶ 39. It should be noted, however, that there is a distinction between testimony concerning accident investigation and testimony concerning accident reconstruction. Accident investigation involves the collection and recording of information, while accident reconstruction involves the use of scientific methodology to draw inferences from investigative data. *See Scott v. Yates*, 71 Ohio St.3d 219, 221, 643 N.E.2d 105 (1994). "As a result, police officers who have not been qualified as accident-reconstruction experts may not give opinions on the cause of an accident, but rather, may testify only about their collection of data and observations at the accident scene." *Roy v. Gray*, 197 Ohio App.3d 375, 2011-Ohio-6768, 967 N.E.2d 800 (1st Dist.), ¶ 11.

{¶44} This court has observed that "the mere label of 'accident investigator' versus 'accident reconstructionist' is not determinative of an expert's qualifications. See, e.g., *State v. Rhodes* (Dec. 14, 2001), 11th Dist. No.2000-L-089. A court must examine the expert's qualifications, education, and knowledge in order to determine the scope of his or her expertise. Id. 'Once qualified, an expert witness may give an opinion only as to matters within his or her expertise.' *Metro. Life Ins. Co. v. Tomchik* (1999), 134 Ohio App.3d 765, 777, 732 N.E.2d 430, citing *State v. Hopfer* (1996), 112 Ohio App.3d 521, 559, 679 N.E.2d 321." *State v. DeWalt*, 7th Dist. No. 06 CA 835; 2007-Ohio-5248, ¶ 39.

{¶45} Moreover, the Ohio Supreme Court has affirmed that "[t]he officer's credibility remains an issue for the trier of facts." *Barberton v. Jenney*, 126 Ohio St.3d 5, 2010-Ohio-2420, 929 N.E.2d 1047, ¶ 18 (2010), citing *State v. Diar*, 120 Ohio

St.3d 460, 900 N.E.2d 565, ¶ 120 (2008), quoting *DeHass* at paragraph one of the syllabus. "Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *Jenney* at ¶ 20, quoting *State v. Konya*, 2d Dist. No. 21434, 2006-Ohio-6312, ¶ 6.

**{¶46}** In this case, Detective Garcar demonstrated that she possessed the specialized knowledge, skill, experience, training or education required by Evid.R.702(B) to qualify as an accident reconstruction expert. Detective Garcar testified that she has been a police officer for twenty years. Garcar is also assigned to the department's accident investigation unit, and has been there for thirteen years. Garcar received her bachelor's and master's degree in criminal justice from Youngstown State University. Garcar is also OPOTA certified, and has attended several courses through the Ohio State Highway Patrol. Previously, Garcar has attended an accident reconstruction course at Northwestern University. Over the course of her career, Garcar has investigated more than one-hundred traffic accidents that involved fatalities. Additionally, Garcar had previously qualified as an expert in accident reconstruction in the Mahoning County Common Pleas Court.

**{¶47}** In sum, based upon her education, experience, knowledge, and training, Garcar qualified as an accident reconstruction expert who could render her opinions concerning the distance between the point of impact of the vehicles and the vehicles' resting place, and the speed of Brady's vehicle based upon further damage sustained by the vehicles. Thus, the trial court did not abuse its discretion in allowing the admission of her testimony.

**{¶48}** Therefore, Brady's second assignment of error is without merit.

**{¶49}** The judgment of the trial court is affirmed.

Vukovich, J., concurs.

DeGenaro, P.J., concurs.