[Cite as *State v. Davis*, 2021-Ohio-1693.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-190302 |
| | | TRIAL NO. B-1606171 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N.* |
| SAMANTHA DAVIS, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Reversed and Cause Remanded

Date of Judgment Entry on Appeal:  May 17, 2021


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Mary Stier*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Krista Gieske,* Assistant Public Defender, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

{¶1}     Samantha Davis appeals her convictions following a jury trial for two counts of aggravated vehicular homicide for recklessly causing the deaths of Sandra Tell and Sabrina Miller while driving with a suspended license. For the following reasons, we reverse the judgment of the trial court and remand the cause for a new trial consistent with this opinion.

## Factual Background

{¶2}     While driving to work on August 6, 2016, Samantha Davis lost control of her truck and crashed into a concrete barrier on the exit ramp from I-275 to I-71. Davis was ejected from the truck, and the truck traveled over the side of the exit ramp and landed on a vehicle traveling on southbound I-71. Sandra Tell, the driver of the vehicle, and her passenger Sabrina Miller were immediately killed upon impact.

{¶3}     Davis was charged with two counts of aggravated vehicular homicide for causing the deaths of Tell and Miller while operating a motor vehicle under the influence and driving with a suspended license, two counts of aggravated vehicular homicide for recklessly causing the deaths of Tell and Miller while driving with a suspended license, and two counts of aggravated possession of drugs for possessing two oxycodone pills. We note that Davis did not appeal the drug convictions, and therefore, they are not part of this appeal.

## Trial Testimony

{¶4}     Several witnesses to the accident testified at trial. Shane Meyer, who had been an Ohio State Highway patrol officer for almost a year at the time of the accident, was driving on the exit ramp that morning. Meyer was traveling

approximately 55-60 m.p.h. and noticed a pickup truck behind him that was going 65-70 m.p.h. The truck steered off to the left, appeared to steer directly into the northbound wall of the overpass, and then went over the top of the overpass. Meyer did not see a car behind the truck. At the time, he did not realize that the driver had been ejected.

{¶5} Meyer stopped in the middle of the road and called 911. Meyer drove onto I-71 then drove back to the overpass. When he returned, an off-duty doctor and a nurse were assisting Davis. Meyer retrieved his first-aid kit for the doctor and observed Davis while the doctor and nurse were administering first aid. He did not smell alcohol and was unable to determine if she exhibited any signs of impairment. Over objection, Meyer testified that he believed she was impaired by drugs because he heard Davis state multiple times that she needed her truck, needed to go to work, and was running late. Based on these statements, Meyer concluded that Davis was impaired because she was unaware of what had just occurred.

{¶6} That morning, Meyer gave a statement to the Montgomery Police Department. On cross-examination, defense counsel pointed out that Meyer's statement did not mention that the truck had veered to the left before hitting the wall. Meyer's initial recollection was that it appeared that the driver steered directly into the wall on the right. Meyer also did not report that he thought Davis was impaired.

{¶7} Meyer testified that he had completed a week of standardized field-sobriety testing training and was familiar with the National Highway Traffic Safety Administration ("NHTSA") manual relating to OVI detection and standardized field-sobriety testing administration. Meyer admitted that he had not spoken with Davis,

he was standing a few feet away from her, he did not conduct any field-sobriety testing, and he did not observe any indicators of drug impairment.

{¶8} Sergeant Mike Plaatje, a police officer with the city of Montgomery, was dispatched to the accident at 7:50 a.m. As he was driving to the scene, he heard multiple additional dispatches, one stating that a vehicle may have come off the ramp to I-275 onto I-71 south. Plaatje arrived on the scene first and saw two heavily damaged vehicles, a Nissan and a Dodge Ram pickup truck. The Nissan contained two occupants who were deceased. No one was in the Dodge Ram pickup, which indicated that someone had been ejected from the truck. He began searching the area for any occupants who may have been ejected. Additionally, Plaatje testified that the speed limit on the ramp is 65 m.p.h. and that there are no signs on the ramp advising motorists to slow down.

{¶9} Sergeant Thomas Shreve, a field training officer and road patrol officer with the Montgomery Police Department, responded to the scene to take photographs. He photographed the initial impact area, gouge marks on the roadway, and overviews of southbound I-71. Shreve also photographed the bodies of the deceased individuals. Exhibit 13O depicted the dead occupants of the vehicle, exhibit 13P was a close up of the deceased passenger, exhibit 13Q showed the driver's hand still on the gearshift, exhibit 13R was taken from the driver's side and shows a deep laceration on the deceased's neck with sharp glass embedded in the neck, exhibit 13S was a close up of the driver's head, exhibit 13T was a close up of the driver with biological matter on the seatbelt, and exhibit 13U depicted the driver's brain matter that was found on the rear passenger floorboard. Shreve took these photos after the top was removed from the car.

4

{¶10} Davis objected to the photographs, exhibits 13O-13U, due to their graphic nature, arguing that the only probative value was to show that the accident caused the victims' deaths, which Davis was willing to stipulate. Davis further contended that the gruesome photographs would inflame the passions of and prejudice the jury. The trial court overruled the objection, and all of the photographs were admitted.

{¶11} Scott Reed, a firefighter and paramedic from the Blue Ash Fire Department testified that he responded to the overpass and treated Davis. Davis stated that a car had been tailgating her truck and then clipped her truck causing both vehicles to lose control. She was ejected onto the ramp while her truck went over the barrier.

{¶12} Reed placed a neck collar and back board on Davis. She had road rash abrasions from her head to her toes. Reed monitored all her vital signs and assessed her Glasgow Coma score. The Glasgow Coma score assesses the alertness of a trauma patient on a scale from 1 to 15. The more alert and oriented the patient is, the higher the score. Reed initially assessed her at a 13 because she was confused and unsure if she had lost consciousness. Ten minutes later, he assessed her at a 15. Reed also indicated that Davis had no indicators of alcohol or drug use. Reed transported her to Bethesda Hospital.

{¶13} Natalie Zimmerman, a registered nurse in the emergency room at Bethesda Hospital, testified that she was the charting nurse for Davis. Her job was to document all of the patient care that Davis received. To that end, Zimmerman created a trauma chart for Davis documenting that Davis was alert and oriented and received a score of 15 on the Glasgow Coma score. Her pupils were not constricted,

and she was not nodding out or complaining about cotton mouth or facial itching, all indicators of drug impairment.

{¶14} In order to assess the injuries, Davis was undressed. Davis was wearing three bras that day. Davis allowed the nurses to remove her bras. They found a small white container, a small straw in her bra, and a small bag with a green leafy substance that appeared to be marijuana. In the container, they found one round pill, one oblong white pill, and a half of a little blue pill. Davis initially explained that her mother was a doctor and had proscribed the pills. Shortly afterward, Davis stated that her mother was a nurse and that she had taken the pills from her mother. The baggie, straw, and pills were given to the responding officer, Officer Alexis Guilkey.

{¶15} After Guilkey arrived, she read some legal papers to Davis and asked her to consent to give a blood sample. Davis consented, and Zimmerman collected two vials of blood. Zimmerman testified that Davis understood what Guilkey was reading to her.

{¶16} Officer Alexis Guilkey, a police officer with the city of Montgomery, testified that she was dispatched to the hospital to meet with Davis. Guilkey started her career with the Ohio State Highway Patrol in 2010 where she received training in ADAPT[1] and NHTSA to detect drug and alcohol impairment. When Guilkey arrived at the hospital, she was given the contraband that was found in Davis's bra. She spoke with Davis who was clear and answered her questions. Because of the oddness of the crash and the drugs found on Davis, Guilkey read Davis BMV form 2255 and requested a blood draw.

---

[1] Guilkey did not explain what ADAPT training entails.

{¶17} On cross-examination, Guilkey testified that if she had witnessed the accident and believed the driver was impaired, she would have reported that information to an investigating officer. Although Guilkey believed that Davis might have been impaired due to the drugs and straw found in her bra, she did not observe any of the clues listed in the NHTSA manual for alcohol or drug impairment and had not conducted any field-sobriety tests.

{¶18} Next, the state called Officer Jason Swartwout, an accident reconstructionist from the city of Blue Ash to testify. Swartwout had over 500 hours of traffic experience and training in traffic safety and accident reconstruction. On the morning of the accident, he reported to the scene and met two accident reconstructionists that worked for the city of Blue Ash, Sergeant Coleman and Officer Baumgartner. The three of them walked the scene looking for evidence and taking measurements. They found no evidence that another car had hit Davis's truck on the ramp.

{¶19} Swartwout testified that they were trying to determine who was at fault and if speed was a factor. When they looked at the overpass they found a critical speed yaw. Swartwout explained that when a vehicle makes a hard turn without braking, the vehicle skids a bit leaving some evidence on the road. That evidence is called a critical speed yaw. If there is enough evidence on the road, they can take measurements to try to determine the speed of the vehicle. A critical speed yaw gives a true speed of the vehicle. Swartwout further explained that if a driver slams on the brakes and skids to a stop, they can measure the skid marks to determine a minimum speed required to make the skid. A critical speed yaw is different because it gives a true speed.

{¶20} While on the overpass, the officers found what appeared to be a true critical speed yaw that they measured and photographed. The team looked at the evidence and determined it did not quite meet all of the elements of a true critical speed yaw. They attempted to determine the drag factor which is how much grip the road had. Swartwout explained that if a driver turns and the car starts to slide, it will slide easily if the car is driving on ice. However, if the car is driving on concrete or blacktop, those surfaces have different drag factors.

{¶21} To determine the drag factor of Davis's truck, they recreated the environment at the time of the accident. The team asked the fire department to spray the road with water because it was reported that there was water on the road at the time of the accident. Next, they retrieved a city owned pickup truck and used a device called the Vericom machine, which measures a vehicle's acceleration and deceleration.

{¶22} Then Swartwout drove the vehicle and attempted to get a drag factor for the road. He concluded that the mark left on the road that they initially believed was a critical speed yaw was more likely caused by the side wall of a tire. Swartwout explained that when an underinflated tire turns, the tire will roll over and start to ride half on the tread and half on the sidewall. The skid mark on the road was more consistent with an underinflated tire than a true critical speed yaw. Because they did not have full confidence that the mark was a critical speed yaw, they could not measure the speed of the truck. Swartwout opined that the mark was more consistent with an underinflated tire that was subject to an overcorrection situation.

{¶23} Swartwout concluded that had there been full braking skid marks, they could have determined a drag factor for the road. However, the truck was in such a

bad condition after the accident, it would have been difficult to analyze the braking system to ensure the brakes were working properly. Had they found skid marks, they would have assumed full braking to determine a minimum speed, however, they found no evidence of any braking or skid marks.

{¶24} Swartwout further testified that the crash report that contained the aerial photo best showed the path that the vehicle traveled. After taking measurements from the overpass and the scene of the crash on I-71, the measurements were placed into a program to create a map. Then Swartwout took a Google Earth image and placed it over the measurements to show where the truck went off the overpass, vaulted, and landed on I-71. The map depicting the path is exhibit 16B. When the state sought to admit exhibits 16A-16D, Davis objected, and the following sidebar conference occurred.

> Court: Okay, what's the objection?
>
> Defense Counsel: I'm not feeling hundred percent it's an objection at this point. I just want to reiterate my concern, and [the prosecutor] has been doing a very nice [job] to make sure he doesn't arrive at any kind of scientific conclusion based on his statements so far. Because if he were going to do that, we would need a report from him saying what that was so we could have our own accident reconstructionist.
>
> Court: Are you going to?
>
> Prosecutor: No, we don't because we don't have that opinion.
>
> Court: Is he going to give an opinion?
>
> Prosecutor: About the speed?
>
> Defense Counsel: About anything that would require his level of

expertise. I kind of think he did.

Court: He did. Wait a minute. I can't hear you.

Defense Counsel: He was interpreting the results of the tires, of the skid marks that's the result of his training as an accident reconstructionist, okay.

Court: Okay.

Defense Counsel: I think you could say that was an expert opinion. I think someone could maybe, not me.

Court: I thought he gave an opinion, the ultimate opinion about why and how he hasn't done that.

Following the sidebar conference, state's exhibits 16A-16D were admitted into evidence.

{¶25} Swartwout further testified that the truck should have front brakes, but he did not know whether they were working. One mark that looked more like a smear may have been made by a braking tire and may have hit at an angle that caused the smear. Based on the picture, Swartwout concluded that the vehicle was most likely not braking or the brake system was not functioning properly.

{¶26} On cross-examination, Swartwout testified that a mechanic is not typically engaged to determine if any of a vehicle's systems were functional. In some training examples, maintenance examined the vehicle to determine whether a mechanical problem caused the crash. However, Swartwout himself never had a mechanic inspect a vehicle. After the accident, Swartwout believed it would be difficult to determine whether the systems were functioning properly due to the condition of the truck, so they did not try.

{¶27} Officer Paul Payne testified that he worked for the city of Montgomery Police Department and was dispatched to the scene of the accident. Payne ran the 30-day tag from the truck to identify the owner as Samantha Davis. The temporary tag had expired in October 2015. The driver's license attached to the vehicle's registration belonged to Samantha Davis. Payne determined that Davis was driving under suspension.

{¶28} The state presented a toxicologist from the Hamilton County lab, Robert Topmiller. Prior to his testimony, the trial court prohibited both Topmiller and the defense expert from concluding whether Davis was or was not impaired. Next, the court addressed Davis's outstanding motion in limine to limit Topmiller's testimony to the toxicology report that was provided to Davis.

{¶29} Davis requested that the court exclude any testimony from Topmiller as it related to the effects of drugs on Davis or Davis's impairment. The basis of the request was that the state did not provide an expert report in accordance with Crim.R. 16(K) because Topmiller did not prepare or provide a written report to Davis summarizing his conclusions. Davis argued that any testimony regarding impairment would prejudice her. The trial court overruled the motion, and Topmiller testified.

{¶30} Topmiller signed off on the toxicology report involving Davis. Davis's blood had been analyzed to determine if any drugs were present. Topmiller testified that Davis's blood contained oxycodone and oxymorphone. Oxycodone is a schedule II narcotic, marketed under the trade name Percocet. Although oxymorphone is a schedule II narcotic, it is also a metabolite the body generates when oxycodone has been ingested. He could not determine whether the oxymorphone was present due

to the metabolism of oxycodone or due to the consumption of both drugs. In Topmiller's opinion, a person would have to take more than a five or ten milligram dose of Percocet to obtain the level of drugs in Davis's system.

{¶31} Topmiller opined that the combination of both drugs in Davis's body was consistent with impaired driving and would lead to some degree of impairment. He further explained that oxycodone causes drowsiness, sedation, confusion, maybe some coordination problems, and slurred speech. It also prevents a person from thinking clearly and logically, so if a person is driving, that person would have diminished attention control and decision making. Reaction time is prolonged and responses are slower. According to Topmiller, the inability to navigate a curve would be consistent with some level of impairment.

{¶32} The state's final witness was forensic pathologist and deputy coroner Dr. Gretel Stephens who conducted the autopsies on both decedents. Dr. Stephens testified that blunt impact injuries caused Miller's and Tell's deaths, and the manner of death was accidental. Both women died immediately and had such massive central nervous injuries that they may never have known what had happened. Dr. Stephens discussed the very extensive injuries to both women and explained that she suggested using the crime-scene photos because the autopsy photos were bloodier and did not show the injuries as clearly as the crime-scene photos. Over objection, Dr. Stephens was shown the crime-scene photos from inside the vehicle marked state's exhibits 13O-13U and immediately responded, "I didn't think we were going to use some of these." When told the photos had already been admitted, Dr. Stephens stated, "I certainly would not use U. The others are not quite so bad. There's one that's kind of redundant. * * * Just shows glass shard and arms and blood." Dr.

Stephens then reviewed the photos and explained the injuries depicted in exhibits 13O, 13P, 13R, and 13T. After her testimony, the state rested.

{¶33} Davis called Dr. Robert Belloto to testify as an expert on her behalf. Dr. Belloto has a pharmacy degree, a Master's Degree in Pharmaceutical Chemistry, a Ph.D. in clinical pharmacology, and a Master's Degree in Statistics. Dr. Belloto was licensed to practice pharmacy and certified as a pharmacotherapy specialist and a geriatric pharmacist. Dr. Belloto was qualified as an expert in pharmacology, toxicology, and statistics.

{¶34} Dr. Belloto testified that the amount of oxycodone and oxymorphone was consistent with a dosage of five or 10 milligrams. By using pharmacokinetics, one of the subjects he teaches, he can determine the dosage. Pharmacokinetics is the study of the absorption, distribution, metabolism, and excretion of drugs and their pharmacological and toxicological effects. To a reasonable degree of scientific certainty, Dr. Belloto determined that the amount of oxymorphone and oxycodone in Davis's system did not play a role in the accident. The amount was not consistent with an amount that would negatively affect a driver.

{¶35} Davis testified on her own behalf and admitted that she took medication that was not prescribed to her. Sometimes, if she wanted to administer it faster, she would crush it and snort it or put it in her drink. Davis explained that she has endometriosis and sometimes has excruciating pain to the point that she cannot get out of bed. Davis only took the medication if she could not work or get out of bed. The night before the accident, she was in pain and took a Percocet.

{¶36} Davis owned the 1995 Dodge Ram truck and testified that it had minor problems. Sometimes, the driver's side door would not latch correctly, and Davis

had to use a screwdriver to get the door to close. The right rear tire, on the passenger side, was low on air. Davis had recently repaired the tire with Fix-A-Flat. Admittedly, the truck was old, but the truck operated fine and was maintained.

{¶37} On the morning of the accident, Davis was driving on the ramp when she heard a noise. She tried to turn the steering wheel, but something was wrong, as if the truck "had a mind of its own." She thought that a car, that had been tailgating her on I-71, had clipped her truck causing it to fishtail and hit the wall. Davis did not remember being ejected from the truck, but she remembered being questioned while on the ramp and asking where her truck went. After her testimony, the defense rested.

{¶38} Davis was convicted of both charges for recklessly causing the deaths and the two possession charges. The jury acquitted her of the two charges for causing the deaths while operating her vehicle while under the influence. Davis was sentenced to an aggregate prison term of eight years.

{¶39} Raising five assignments of error, Davis challenges the convictions for recklessly causing the deaths of Tell and Miller. She contends that the trial court abused its discretion in failing to accept a stipulation that the car accident caused the two deaths, the trial court abused its discretion in admitting gruesome photographs which were not probative and were designed to sway the juror's emotions, the aggravated-vehicular-homicide convictions were based on insufficient evidence and against the manifest weight of the evidence, the state committed prosecutorial misconduct, and she was deprived of her right to the effective assistance of trial counsel.

The Proposed Stipulation

**{¶40}** In the first assignment of error, Davis argues that the trial court abused its discretion in failing to accept her offer to stipulate to the incontestable fact that the decedents died as a result of the automobile accident, which effectively deprived her of a fair and impartial trial.

**{¶41}** Davis asserts that her offer to stipulate that the automobile accident resulted in both deaths should have been accepted by the court as sufficient proof of an essential element of the offense. Davis further contends that rejecting the stipulation allowed the state to present gruesome photographs depicting the bodies.

**{¶42}** In essence, Davis is requesting this court to extend the holding in *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, a decision in which the Ohio Supreme Court determined that a trial court abuses its discretion when the trial court "refuses a defendant's offer to stipulate to the fact of the prior conviction." *Id.* at ¶ 40. However, the rationale of *Creech* is inapplicable here. In *Creech*, the Ohio Supreme Court acknowledged that the nature of a prior conviction could be used as propensity evidence to improperly influence a jury. *Id.* at ¶ 20. The prior conviction concerned a defendant's legal status independent of the elements the state was required to prove in the current prosecution. *Id.* at ¶ 38. Therefore, the stipulation to the defendant's status eliminated the possibility of undue prejudice without interfering with the state's ability to prove its current case. *Id.* at ¶ 38-39.

**{¶43}** Furthermore, *Creech* is limited to stipulations regarding prior convictions. Davis cites to no authority to support her argument that a trial court abuses its discretion when it refuses to accept a stipulation to an essential element of the current offense that the automobile accident resulted in death. We overrule the

first assignment of error.

The Admission of the Photographs

**{¶44}** Next, Davis contends that the trial court abused its discretion in admitting irrelevant, inflammatory, prejudicial evidence in the form of gruesome photographs from the crash scene, the cumulative effect of which denied Davis a fair and impartial trial. Specifically, Davis objects to state's exhibits 5C-5E, the three photographs depicting the Jaws of Life extrication, and state's exhibits 13O-13U, the gruesome photographs depicting both deceased bodies at the crime scene. Davis unsuccessfully sought to exclude the gruesome photos before trial and again objected to them at trial.

**{¶45}** The admissibility of gruesome photographs in a noncapital case is considered under Evid.R. 403. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 95-96, quoting *State v. Morales*, 32 Ohio St.3d 252, 257-258, 513 N.E.2d 267 (1987). Under Evid.R. 403(A), a trial court must exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." A trial court's admission of relevant evidence under Evid.R. 403(A) is reviewed for an abuse of discretion. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 107, citing *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus.

**{¶46}** With respect to exhibits 5C-5E, the photographs were admitted during the testimony of Lieutenant Thomas Wolf, whose unit was responsible for extricating the bodies. The photographs showed several firefighters working to remove the bodies from the car. At the time, a white sheet had been placed over the vehicle to

conceal the body of the driver. Although the passenger's body was visible, the photographs did not depict any blood or any injures to the body, and were not gruesome. Therefore, there was no error in admitting them into evidence.

{¶47} Exhibits 13O-13U depicted the deceased bodies at the crime scene. Dr. Stephens suggested using these photos because they showed the injuries more clearly and were less bloody than the autopsy photos. She used the photographs to highlight her testimony about the autopsies. Dr. Stephens admitted that exhibits 13O and 13P, which she used while discussing the injuries to Miller, were repetitive. Although the probative value to aid Dr. Stephen's testimony outweighed the danger of any prejudice, we conclude that only one of these photographs should have been admitted into evidence.

{¶48} Exhibit 13R was used by Dr. Stephens to discuss the injuries to both bodies, and exhibit 13T was used to show the laceration by the shoulder harness and the blood on Tell. We conclude that the probative value of both exhibits 13R and 13T outweighed the danger of any prejudice to Davis. However, exhibit 13S, which was extremely gruesome and repetitive to exhibit 13T, and exhibit 13U, depicting the driver's brain matter and also extremely gruesome, were not used by Dr. Stephens, and therefore, had no probative value and should not have been admitted.

{¶49} Although Dr. Stephens did not use exhibit 13Q, which depicted Tell's hand still on the gear shift, the photograph was relevant to Shreve's testimony to illustrate his conclusion that the deaths occurred instantaneously, and therefore, the probative value outweighed the danger of any prejudice to Davis.

{¶50} In summary, exhibits 13Q, 13R, and 13T were admissible, exhibits 13O and 13P were repetitive, so only one was admissible, and exhibits 13T and 13U were

inadmissible.

{¶51} We further determine that any error in the admission of the repetitive photographs, or in the admission of the photographs lacking probative value, was harmless which is evidenced by the fact that the jury acquitted Davis of the most serious charges. *See State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 111. Accordingly, we overrule the second assignment of error.

Sufficiency and Manifest Weight

{¶52} In her third assignment of error, Davis contends that the convictions were based on insufficient evidence and contrary to the manifest weight of the evidence.

{¶53} "In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt." *State v. Ham*, 1st Dist. Hamilton No. C-170043, 2017-Ohio-9189, ¶ 19, citing *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶54} When considering a challenge to the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *State v. Martin*, 20 Ohio App.3d

172, 485 N.E.2d 717 (1st Dist.1983), paragraph three of the syllabus.

{¶55} Davis was convicted of two counts of aggravated vehicular homicide in violation of R.C. 2903.06(A)(2)(a), which provides that, "[n]o person, while operating or participating in the operation of a motor vehicle, * * * shall cause the death of another * * * [r]ecklessly[.]"

> A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

R.C. 2901.22(C).

{¶56} The state was required to prove that: (1) the defendant operated a motor vehicle; (2) in a reckless manner; (3) which caused the death of another. *See State v. Waldock*, 2015-Ohio-1079, 33 N.E.3d 505, ¶ 71 (3d Dist.). The recklessness element of aggravated vehicular homicide focuses on "the state of mind of the defendant as to (1) the known risk, and (2) his perverse disregard of the same with heedless indifference to the consequences." *Id.* at ¶ 72, quoting *State v. Gates*, 10 Ohio App.3d 265, 267, 462 N.E.2d 425 (3d Dist.1983). "A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶57} Here, it is undisputed that Davis lost control of her vehicle on the

overpass and that her truck vaulted the overpass and landed on a Nissan causing the deaths of Tell and Miller. Davis contends that the state presented insufficient evidence to prove that she recklessly caused the deaths. At trial, the state argued that Davis was reckless for driving on an underinflated tire, driving at an excessive rate of speed considering her unroadworthy vehicle, and driving with drugs in her system. In assessing whether a defendant's conduct was reckless, the focus is on the specific risk created by the defendant's conduct. *See State v. Davis*, 172 Ohio App.3d 25, 2007-Ohio-2730, 872 N.E.2d 1263, ¶ 16 (10th Dist.)*.*

{¶58} In this case, Meyer testified that Davis's truck steered off to the left, appeared to steer directly into the northbound wall of the overpass, and then went over the top of the overpass. Additionally, Meyer testified that he believed Davis was impaired by drugs because she repeatedly stated that she needed her truck, needed to go to work, and was running late.

{¶59} Swartwout, the accident reconstructionist, opined that the mark on the road was consistent with an underinflated tire that was subject to an overcorrection. Swartwout further testified that he found no evidence of any braking or skid marks. Swartwout's testimony supported the state's theory that Davis was driving with an underinflated tire and driving an unworthy vehicle at an excessive speed.

{¶60} Topmiller testified that the level of drugs in her blood was consistent with an individual driving impaired and that it would cause drowsiness, sedation, confusion, maybe some coordination problems, slurred speech, and diminished attention control and decision making. He further explained that the level of impairment would cause a prolonged reaction time and a slower response. The inability to navigate a curve would be consistent with some level of impairment. An

overcorrection due to an underinflated tire or a failure to brake would also be consistent with a judgment error caused by the effects of the drugs.

{¶61} The combination of Meyer's, Swartwout's, and Topmiller's testimony provided sufficient evidence for the jury to find that Davis operated her vehicle in a reckless manner. The state presented evidence that Davis had drugs in her system, exhibited behavior consistent with a person demonstrating a level of drug impairment, and caused an accident consistent with an error in judgment induced by the ingestion of drugs. *See State v. Ward*, 4th Dist. Ross No. 03CA2703, 2003-Ohio-5847, ¶ 11-12 (concluding that evidence of impairment and the effects of the impairment on driving ability is sufficient to support the defendant acted recklessly); (Citations omitted.) *State v. Crabtree*, 10th Dist. Franklin No. 09AP-1097, 2010-Ohio-3843, ¶ 18 (although the jury "was not convinced defendant was under the influence of alcohol to the degree needed to violate R.C. 4511.19(A), consuming alcohol prior to operating a motor vehicle may demonstrate heedless indifference to the consequences of one's actions and a perverse disregard of a known risk as is required by R.C. 2901.22 to demonstrate reckless conduct.").

{¶62} Viewed in the light most favorable to the prosecution, the evidence is sufficient to prove that Davis's ingestion of drugs led to her heedless indifference to the risks associated with her ability to act and react due to the effects of the drugs, causing the deaths of Tell and Miller.

{¶63} Considering the evidence, a rational trier of fact could believe that Davis was driving while under the influence of a drug of abuse, even if the jury did not believe she was legally impaired. *See State v. Wamsley*, 9th Dist. Summit No. 19484, 2000 WL 141080, *3 (Feb. 2, 2000) (concluding that "[a]lthough the jury

21

found Mr. Wamsley not guilty of driving under the influence of drugs or alcohol, there was sufficient evidence for the jury to conclude that Mr. Wamsley's consumption of alcohol that evening, while not being legally intoxicated, created a situation which was likely to result in an incident such as that which occurred."). One could rationally conclude that Davis's ability to act and react were diminished due to the ingestion of drugs. Therefore, the evidence does not weigh heavily against the conviction. This assignment of error is overruled.

### Ineffective Assistance of Counsel

{¶64} For ease of discussion, we next address Davis's fifth assignment of error. In her fifth assignment of error, Davis argues that she was deprived of the effective assistance of counsel because counsel failed to engage an automotive expert to render an opinion and for withdrawing the objection to the state's failure to provide an expert report from Swartwout.

{¶65} To establish ineffective assistance of counsel, an accused must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the accused. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The failure to make either showing is fatal to the claim. *Id.* at 697. A defendant is prejudiced by counsel's performance if there is a reasonable probability that the outcome of the proceedings would have been different but for the complained-of conduct. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

{¶66} Generally, the decision not to call an expert witness does not constitute ineffective assistance of counsel because that decision is solely a matter of trial strategy. *State v. Coleman*, 45 Ohio St.3d 298, 307-308, 544 N.E.2d 622 (1989).

Any testimony that a crime scene reconstructionist would have provided is purely speculative. *See State v. Madrigal*, 87 Ohio St.3d 378, 390, 721 N.E.2d 52 (2000). Because Davis cannot demonstrate that the outcome of the proceedings would have been different had her counsel hired an expert, we cannot conclude that her counsel was ineffective for not hiring an accident reconstructionist. *See State v. McHenry*, 1st Dist. Hamilton No. C-170671, 2018-Ohio-3383, ¶ 25.

{¶67} With respect to the failure to object to Swartwout's testimony, the state conceded that Swartwout's testimony regarding his efforts to determine the truck's speed was expert testimony that was improperly admitted because he failed to provide a report as required by Crim.R. 16(K).

{¶68} However, the state argues that most of Swartwout's testimony was based on his observations as a lay witness. We disagree. Swartwout prefaced his testimony by explaining to the jury that he was an accident reconstructionist with over 500 hours of traffic experience and training in traffic safety and accident reconstruction. Accident reconstruction "involves the use of scientific methodology to draw inferences from investigative data." *State v. Brady*, 7th Dist. Mahoning No. 13 MA 88, 2014-Ohio-5721, ¶ 43. Swartwout collected data, drew inferences from the data, and offered his expert opinion as to the cause of the accident. *See Roy v. Gray*, 197 Ohio App.3d 375, 2011-Ohio-6768, 967 N.E.2d 800, ¶ 14 (1st Dist.) (concluding that when a police officer drew inferences from data he collected to opine on the cause of the accident, he "render[ed] an expert accident-reconstruction opinion"). Consequently, the entirety of Swartwout's testimony constituted accident-reconstruction expert testimony.

**{¶69}** Swartwout provided substantive expert opinions without submitting an expert report as required by Crim.R. 16(K). Thus, the state violated Crim.R. 16(K), and it was error to admit Swartwout's opinion testimony. *See State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44, ¶ 1 (holding that "it is error to admit expert-opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K)."); *State v. Hall*, 1st Dist. Hamilton Nos. C-170699 and C-170700, 2019-Ohio-2985, ¶ 20 (explaining that the trial court erred by allowing "expert opinions submitted without a report"). It is well-established that the failure to comply with Crim.R. 16(K) renders an expert's opinion testimony inadmissible, and the failure to object to the admission of the expert testimony cannot be excused as trial strategy. *See id.* Therefore, we conclude that trial counsel's performance was deficient for withdrawing the objection.

**{¶70}** Turning to the second *Strickland* prong, counsel's failure also demonstrates a reasonable probability that the deficient performance prejudiced Davis and undermines our confidence in the outcome. *See Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. As previously discussed, Swartwout's testimony was instrumental in establishing that Davis operated her vehicle in a reckless manner, either by driving too fast considering the condition of the truck and the underinflated tire, by overcorrecting when the underinflated tire rolled, or by failing to brake. Swartwout's testimony provided several possible causes of the accident which were consistent with judgment errors that may be induced by the ingestion of drugs.

**{¶71}** "[T]he weight that expert testimony carries with the jury is

fundamentally different than that of lay testimony (particularly where the expert is a police officer), and countering such testimony requires unique considerations, of which defense counsel was deprived in this instance." *Hall* at ¶ 23. Without the expert testimony, the jury may have considered the remaining evidence in a different light. The significance of Swartwout's testimony is further reflected by the fact that the jury acquitted Davis of the two aggravated-vehicular-homicide charges for causing the deaths of Tell and Miller while operating a motor vehicle under the influence.

**{¶72}** Accordingly, we sustain the fifth assignment of error.

## Topmiller's Testimony Exceeded the Scope of his Expert Report

**{¶73}** In reviewing the record and analyzing the sufficiency of the evidence, we noted the significance of Topmiller's testimony. During the trial, Davis filed a motion in limine to exclude any testimony from Topmiller as it related to impairment because Topmiller did not provide a written report to Davis summarizing his conclusions. The trial court denied the motion. As previously discussed, "it is error to admit expert-opinion testimony when the expert's opinion was not set forth in a written report prepared in compliance with Crim.R. 16(K)." *Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, 153 N.E.3d 44 at ¶ 1. However, appellate counsel never raised this issue on appeal.

**{¶74}** We requested supplemental briefing from the parties addressing Topmiller's expert testimony on impairment. The state conceded that, although Topmiller provided a toxicology report, his testimony regarding impairment was expert testimony that exceeded the scope of the report and should have been excluded. The state also acknowledged that this court could review the forfeited

error of appellate counsel under Crim.R. 52.

{¶75} The state violated Crim.R. 16(K), and the trial court erred in allowing Topmiller's opinion testimony that exceeded the scope of the toxicology report. *See Boaston* at ¶ 58; *Hall*, 1st Dist, Hamilton Nos. C-170699 and C- 170700, 2019-Ohio-2985 at ¶ 20. As previously discussed, the testimony of Topmiller provided substantial evidence to support the convictions. Topmiller's testimony regarding the effects that the drugs would have on Davis's ability to drive was critical in proving recklessness and bolstered Meyer's testimony regarding Davis's impairment. Moreover, in closing, the state highlighted and emphasized Topmiller's testimony to support the convictions.

{¶76} However, we have decided not to sua sponte address appellate counsel's ineffectiveness because we have sustained Davis's fifth assignment of error.

## Prosecutorial Misconduct

{¶77} In her fourth assignment of error, Davis argues that prosecutorial misconduct perpetrated during closing arguments deprived her of her rights to due process and a fair trial. Davis contends that the prosecutor committed misconduct in closing argument by improperly inserting personal opinion and commenting on the purported strength of the state's case, misrepresenting the defense's position, denigrating defense counsel, and improperly referencing punishment.

{¶78} Davis did not object to any of the statements, and has waived all but plain error. *See* Crim.R. 52(B). A defendant has the burden of demonstrating plain error under Crim.R. 52(B). *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14. "Prosecutorial misconduct rises to the level of plain error only if it is clear the defendant would not have been convicted in the absence of the

26

improper comments." *State v. Smith*, 2017-Ohio-8558, 99 N.E.3d 1230, ¶ 49 (1st Dist.). "Closing arguments must be viewed in their entirety to determine whether the disputed remarks were prejudicial." *Id.*

{¶79} Having reviewed the prosecutor's rebuttal argument in its entirety, the prosecutor inappropriately referred to sentencing with the following statements:

> A lot has been said, and I think [defense counsel's] closing, said * * * if you convict [Davis], this will somehow be another tragedy. And the Judge will tell you that you can't consider punishment at all. Because if you find her guilty, whatever the penalty is left by law to Judge Marsh. And over the last couple weeks you've gotten to know Judge Marsh. And she's an intelligent, compassionate person. And you know, and everybody in the room knows, that she will do the right thing in figuring out what sentence will be appropriate. You cannot consider sentencing at all.

However, the arguments of the state did not deprive Davis of a fair trial. Davis's fourth assignment of error is overruled.

## Conclusion

{¶80} We sustain Davis's fifth assignment of error, reverse the judgment of the trial court, and remand the cause for a new trial, consistent with this opinion, on the two counts of aggravated vehicular homicide for recklessly causing the deaths of Tell and Miller while driving with a suspended license.

Judgment reversed and cause remanded.

**BERGERON** and **CROUSE, JJ.**, concur.

Please note:

The court has recorded its own entry this date.