[Cite as *State v. Kirkland*, 2026-Ohio-586.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :        APPEAL NO.    C-250142
                                     TRIAL NO.     B-2302736

     Plaintiff-Appellee,      :

  vs.                       :

JOHNTYN KIRKLAND,         :
                                       *JUDGMENT ENTRY*

     Defendant-Appellant.   :

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed, and the cause is remanded.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 2/20/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Kirkland*, 2026-Ohio-586.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. | C-250142 |
| | | TRIAL NO. | B-2302736 |
| Plaintiff-Appellee, | : | | |
| vs. | : | *O P I N I O N* | |
| JOHNTYN KIRKLAND, | : | | |
| Defendant-Appellant. | : | | |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed and Cause Remanded

Date of Judgment Entry on Appeal: February 20, 2026


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp,* Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Bryan R. Perkins*, for Defendant-Appellant.

**ZAYAS, Presiding Judge.**

**{¶1}** Johntyn Kirkland appeals his convictions for murder with specifications, following a jury trial, and for having a weapon while under a disability ("WUD"), following a bench trial. In eight assignments of error, Kirkland contends the court erred by allowing prior-bad-act evidence, the prosecutor committed prosecutorial misconduct, the court erred in admitting gruesome photos, his convictions were not supported by sufficient evidence or the weight of the evidence, the record did not support the imposition of consecutive sentences, the court violated his due-process rights during the sentencing hearing, and the court erred by imposing postrelease control on the murder conviction. For the following reasons, we affirm the judgment of the trial court.

### Factual Background

**{¶2}** Kirkland was indicted for two counts of murder with specifications and two counts of having a weapon while under a disability. The victim was his stepfather. Kirkland pled not guilty to the charges and proceeded to a jury trial on the murder charges and a bench trial on the WUD charges. The jury acquitted him of the first murder charge and convicted him on the second murder charge and the accompanying firearms specifications. The trial court found him guilty of both WUD charges, and merged the second WUD conviction with the murder conviction. The court sentenced Kirkland to 15 years to life on the murder conviction, consecutive to a 54-month sentence on the firearm specification, and 36 months on the WUD conviction to be served consecutively to the murder sentence for an aggregate term of 22½ years to life.

## Sufficiency and Manifest Weight

**{¶3}** For ease of discussion, we address the assignments of error out of order. In his fourth and fifth assignments of error, argued together, Kirkland contends the convictions were not supported by sufficient evidence and were contrary to the weight of the evidence.

**{¶4}** When a defendant challenges the sufficiency of the evidence, he is arguing that the State presented inadequate evidence on an element of the offense to sustain the verdict as a matter of law. *State v. Hawn*, 138 Ohio App.3d 449, 471 (2d Dist. 2000). "[T]he question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt." *State v. Ham*, 2017-Ohio-9189, ¶ 19 (1st Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259, 273 (1991), paragraph two of the syllabus.

**{¶5}** In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.* "Although an appellate court may review credibility when considering the manifest weight of the evidence, the credibility of witnesses is primarily an initial determination for the trier of fact." *State v. Brown*, 2024-Ohio-2148, ¶ 17 (1st Dist.), citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. "The trier of fact is best able 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Id.*, quoting *State v. Wilson*, 2007-Ohio-2202, ¶ 24.

{¶6} The jury found Kirkland guilty of murder under R.C. 2903.02(B) for causing the victim's death as a proximate result of knowingly committing or attempting to commit felonious assault. The State presented evidence that Kirkland had an altercation with his stepfather two days before the murder and moved out of the home. The day before the murder, Kirkland texted his stepfather informing him that he could not be around "y'all" and accused "y'all" of killing his little brother, who had committed suicide. Acknowledging that Kirkland was "strapped," his stepfather responded, "You got smoke about something, come speak upon it, about it, with whoever you feel like it." A detective testified that "strapped" meant a person was armed.

{¶7} On the morning of the murder, Kirkland was supposed to leave the apartment with his grandmother, but he refused to go. His grandmother was so concerned about Kirkland's behavior, she wanted to schedule a family meeting to discuss his behavior and actions with him.

{¶8} That morning, the victim drove his wife to work and his daughter to school. When Kirkland's mother left the home that day, the doors were locked, but Kirkland still had a key to the home. He was supposed to return the key, but he kept it. The key was on his keychain. When the victim returned home, he had planned to clean carpets that morning, and he called his wife between 8:00 and 9:00 to tell her the carpet cleaner was not working. Sometime between 9:00 and 11:00 a.m., the victim failed to respond to text messages or answer his phone. Both his wife and daughter had repeatedly tried to contact him. When his daughter arrived to check on him, the back door was unlocked, which was unusual because her father always locked the back door. His daughter found him dead, lying in the foyer.

{¶9} Kirkland's younger brother was at his grandmother's apartment playing

video games when Kirkland knocked on the door. Kirkland had a gunshot wound on his hand, but would not say how he got it. Kirkland's V-neck shirt was on the side of his shoulder, and he was pacing back and forth saying it was a flesh wound. Kirkland continued to pace, and his brother cleaned and bandaged his hand. Kirkland was unable "to get words out," which was very unusual. The younger brother, who was scared, called his grandmother because Kirkland wanted his grandmother to come home. After Kirkland's brother's conversation with his grandmother, the police arrived, and he and Kirkland were detained. When the arresting officer asked Kirkland if anyone else was in the apartment, he responded, "It's me you're looking for."

{¶10} Kirkland's grandmother testified that she picked up Kirkland's mother from work to meet with Kirkland because he had been shot and did not want to go the hospital. By the time Kirkland's mother entered his grandmother's car, she knew her husband was dead, and the grandmother drove her home. While they were driving, Kirkland's younger brother called his grandmother. She asked him if he were being held hostage. His grandmother thought Kirkland might be holding him hostage due to the situation with Kirkland's stepfather. Kirkland's grandmother brought the police to the apartment with her.

{¶11} The criminalist photographed the entire scene. When the criminalist arrived, she entered from the rear of the house, and blood droplets were on the back porch. The victim, who had been pronounced dead, was in the front foyer by a staircase. The criminalist authenticated numerous photos, including the blood spatter on the porch, the bedrooms in the home, and a Speer 9 mm casing on the first landing of the stairwell. Two vacuum cleaners were also on the landing. At the top of the stairs on the floor, she photographed a spring, magazine back-plate, and 33 unfired bullets,

6

which was consistent with a broken magazine.

{¶12} The State's theory was that Kirkland was at the top of the stairs and the victim was on the first landing when Kirkland shot him. After the victim was shot, he fell down the stairs and into the foyer.

{¶13} At the crime scene, a trail of blood led from the second floor to the back porch. The criminalist collected numerous blood swabs, and a forensic biologist testified that the DNA profile of the bloodstains on the wall up the staircase, the entryway, the entry into the kitchen, kitchen floor, a bedroom, and the porch step matched Kirkland. The blood trail ended at the woods behind the home. The woods run along the rear of the house and the apartment, both on Queen City.

{¶14} A video showed Kirkland crashing through the woods and entering the apartment building. Thirty-five minutes prior, a video depicted Kirkland exiting from the building. He was wearing a black pullover sweatshirt, black sweatpants, and maroon Nike gym shoes. A trace-evidence examiner testified that the black hooded sweatshirt tested positive for gunshot residue. The front of the sweatshirt contained a mixture of DNA. The major contributor matched Kirkland, and the minor profile was too minor to make a comparison.

{¶15} Testing of the DNA mixture found on the bullet that killed the victim could not exclude the victim or Kirkland as contributors. The forensic biologist further testified that, "The portion of the population that cannot be excluded from having contributed to this mixture of DNA profiles is approximately 1 in 45,250 individuals." The coroner testified that the victim's death was a homicide due to a gunshot in the left upper chest.

{¶16} Kirkland argues that the convictions were unsupported by the evidence and contrary to the weight of the evidence because no eyewitness testified, the gun

7

used in the murder was not recovered, and Kirkland's hands tested negative for gunshot residue. He further contends that two witnesses never saw him with a gun and no DNA connected him to the numerous bullets found in his mother's house.

{¶17} The State must prove the identity of a perpetrator by proof beyond a reasonable doubt, and it may be proved by direct or circumstantial evidence, which do not differ with respect to their probative value. *State v. Tyler*, 2019-Ohio-4661, ¶ 31 (9th Dist.). Although there were no eyewitnesses to the actual shooting, the State introduced sufficient circumstantial evidence to identify Kirkland as the shooter. "The fact that the gun was not recovered was not fatal to the State's case." *State v. Hill*, 2011-Ohio-2526, ¶ 29 (8th Dist.). Both Kirkland's grandmother and the victim's wife testified that Kirkland owned two guns.

{¶18} Although no gunshot residue was found on Kirkland's hands, gunshot residue was found on his sweatshirt. Additionally, his younger brother cleaned the injured hand, and then Kirkland was treated at the hospital. DNA evidence connected Kirkland to numerous blood drops left at the crime scene, including the blood trail leading to the back porch. The blood trail ended at the woods, and a video captured Kirkland running out of the woods to his grandmother's apartment after the shooting.

{¶19} Kirkland further contends that the evidence was insufficient to support the WUD conviction. After Kirkland's arrest, a loaded Taurus handgun was found under a couch cushion at his grandmother's home. The Taurus contained DNA matching Kirkland. A forensic scientist from the coroner's crime lab testified that the Taurus was operable. While the bullet that killed the victim was not fired from the Taurus, DNA evidence linked Kirkland to the bullet that killed his stepfather and the broken Taurus gun magazine and its parts found near where the murder occurred. Although the murder weapon was not found, circumstantial evidence established that

8

Kirkland was the shooter. Kirkland stipulated to the felony convictions underlying the WUD charges.

{¶20} Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found proof of guilt, beyond a reasonable doubt, that Kirkland murdered his stepfather and possessed a firearm while under a disability. Reviewing the entire record, weighing the evidence, and considering the credibility of the witnesses, we cannot conclude the trier of fact clearly lost its way and created a manifest miscarriage of justice.

{¶21} Accordingly, we overrule the fourth and fifth assignments of error.

## Prior Bad Acts

{¶22} In his first and second assignments of error, argued together, Kirkland contends that the trial court erred as the result of the prosecutor eliciting prior-bad-act evidence, which also constituted prosecutorial misconduct.

{¶23} "Evid.R. 404(B) categorically prohibits evidence of a defendant's other acts when its only value is to show that the defendant has the character or propensity to commit a crime." *State v. Smith*, 2020-Ohio-4441, ¶ 36. The admissibility of other-acts evidence, pursuant to Evid.R. 404(B), is a question of law that must be reviewed using a de novo standard of review. *State v. Hartman*, 2020-Ohio-4440, ¶ 30. If the other-acts evidence was offered for a permissible purpose, the determination of whether to then admit the evidence—after weighing its probative value against its prejudicial effect—is reviewed for an abuse of discretion. *Id.* at ¶ 30.

{¶24} Before Kirkland's family members testified, Kirkland asked the State to remind the lay witnesses not to discuss his prior criminal history. In several witness interviews, the witnesses had mentioned that Kirkland had recently been released from prison.

9

**{¶25}** The victim's daughter, who was also Kirkland's sister, testified that she and her brother had been close a few months before the murder, but they were no longer close. Kirkland objected when the prosecutor asked, "Had something happened between that fractured your relationship in those months leading up to June 12th?" Kirkland objected based on relevance and prior bad acts. The court asked if the sister was going to say anything about a prior conviction. The prosecutor responded that his understanding was that Kirkland was behaving erratically toward his family members. The prosecutor further noted that the sister was cautioned not to discuss Kirkland's incarceration or prior convictions. The court overruled the objection.

**{¶26}** Kirkland's sister responded that Kirkland was dating someone, and he chose that woman over her. When asked "how bad had it gotten after this relationship had started," she responded, "It was bad because he actually threatened me." When Kirkland objected, the prosecutor responded that he was not trying to elicit that testimony and immediately ceased his questioning. The State did not mention the testimony in closing arguments. The prosecutor did not object to a curative instruction, and the court instructed the jury to disregard the statement.

**{¶27}** Assuming that the other-acts testimony was improper, Kirkland cannot establish he has suffered any prejudice as a result. The testimony itself was minor; especially here where his grandmother testified that she was so concerned about Kirkland's behavior and conduct that she wanted to call a family meeting. Additionally, the trial court instructed the jury to disregard the testimony, and "[w]e presume that the jury followed the court's instructions." *See State v. Stidhum*, 2018-Ohio-4616, ¶ 57 (1st Dist.). After excising the improper statement, the remaining evidence adduced by the prosecution was sufficient to overcome any unfair prejudice.

**{¶28}** Kirkland further argues that the prosecutor committed misconduct by eliciting the statement. To establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was improper and prejudicially affected the defendant's substantial rights. *State v. Walker*, 2007-Ohio-6337, ¶ 45 (1st Dist.).

**{¶29}** Here, the witness volunteered the other-acts testimony during her direct examination, and the prosecutor represented that he was not trying to elicit that testimony and immediately ceased his questioning. Additionally, the prosecutor did not object to the curative instruction or mention the testimony in closing remarks. Consequently, we cannot hold that the prosecutor committed misconduct. Even assuming that the questioning was improper, we cannot hold that Kirkland was denied a fair trial. In light of the evidence before the jury, we cannot hold that a reasonable probability exists that, absent the questioning by the prosecutor, the jury would have found Kirkland not guilty.

**{¶30}** We overrule the first and second assignments of error.

### Gruesome Photographs

**{¶31}** Next, Kirkland argues that the trial court erred by admitting gruesome and repetitive photos, specifically, exhibits 4-A and 4-EE. Kirkland argues that the two crime-scene photos depicting the victim's body were graphic and repetitive with minimal probative value because he did not contest "the manner, method, or cause of [the victim's] death."

**{¶32}** "The admissibility of gruesome photographs in a noncapital case is considered under Evid.R. 403." *State v. Davis*, 2021-Ohio-1693, ¶ 45 (1st Dist.). Under Evid.R. 403(A), a trial court must exclude evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." We review a trial court's decision that a photograph satisfies

this standard for an abuse of discretion. *See id*.

**{¶33}** Kirkland objected to exhibits 3-U and 3-Y, arguing they were graphic because they showed the victim's body. The State explained that 3-U was an overview of the body to show its proximity to the door and how the body was discovered. 3-Y showed the blood trail, the blood trail on the stairs and the proximity of the body to the blood trail. The State argued that the photos contained "the most important piece of evidence in the entire case" and helped to show the crime scene and investigation. The court overruled the objection to the photos finding that the crime scene photos were relevant.

**{¶34}** When the State presented two additional photos of the body, exhibits 4-A and 4-EE, Kirkland objected because they were duplicative of the body photos in 3-U and 3-Y, except that the photos in exhibit 4 contained evidence placards. The court agreed that 4-A and 4-EE were duplicative and sustained the objection. In response, the State removed 3-U and 3-Y.

**{¶35}** The criminalist who took the photos testified that exhibit 4-A depicted the body as the police found it at the bottom of the stairs, and 4-EE showed the relationship to the body of the blood drops, labeled with placards E and F. Placard E delineated the first blood spot inside the foyer, and placard F delineated the blood drop on the first stair. The criminalist swabbed the blood drops for DNA. Each swab was packed separately in a box, which was marked by the placard letter to distinguish the locations of the drops. The forensic biologist testified that the blood spot in the entryway, placard E, matched Kirkland, and placard F matched the victim.

**{¶36}** Exhibit 4-A "illustrated the testimony of the detectives who described the crime scene," and also was "probative of [the defendant's] intent and the manner and circumstances of the victims' deaths." *See State v. Mammone*, 2014-Ohio-1942,

¶ 98; *State v. Trimble*, 2009-Ohio-2961, ¶ 135 ("These photographs were relevant to show the position of the victims' bodies at the scene.").  Exhibit 4-EE was relevant to show the location of the blood drop that matched Kirkland and illustrated the testimony of the forensic biologist who tested the blood drops depicted in the photos.  Under these circumstances, the probative value of the two photos outweighed the danger of unfair prejudice to Kirkland.  *See Mammone* at ¶ 100.

**{¶37}**  Accordingly, we overrule the third assignment of error.

### Consecutive Sentences

**{¶38}**  In his sixth assignment of error, Kirkland argues that the trial court erred by imposing consecutive sentences because the record did not support the findings.

**{¶39}**  Under R.C. 2953.08(G)(2)(a), an appellate court may review the trial court's consecutive-sentence findings, and it may "increase, reduce, or otherwise modify" consecutive sentences only if it "clearly and convincingly" finds that the record does not support the trial court's findings.  "An appellate court's inquiry is limited to a review of the trial court's R.C. 2929.14(C) findings."  *State v. Glover*, 2024-Ohio-5195, ¶ 44; R.C. 2953.08(G)(2).

**{¶40}**  Ohio law contains a statutory presumption of concurrent sentences for defendants convicted of multiple offenses.  *State v. Galinari*, 2022-Ohio-2559, ¶ 9 (1st Dist.).  "The general principle set forth in the Revised Code is that concurrent sentences are the default and consecutive sentences are the exception."  *State v. Hitchcock*, 2019-Ohio-3246, ¶ 21.  To impose consecutive sentences, a sentencing court must make the mandatory sentencing findings prescribed by R.C. 2929.14(C)(4).  *See Galinari* at ¶ 9, citing *State v. McKinney*, 2022-Ohio-849, ¶ 11 (1st Dist.).  A trial court must make three distinct findings: (1) "the consecutive service is necessary to

protect the public from future crime or to punish the offender," (2) "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public," and (3) one or more of R.C. 2929.41(C)(4)'s subsections apply. R.C. 2929.14(C)(4).

{¶41} Here, Kirkland concedes that the court made the requisite findings and argues that the record does not support consecutive sentences because the following finding was confusing, "These two or more multiple offenses committed as a single course of conduct aren't so great and so unusual not to reflect the seriousness of the conduct, that you are a felon with a gun. You shot his stepfather. And your history shows consecutive terms that are needed to protect the public."

{¶42} The record reflects that the trial court concluded that the harm caused was the greatest harm a person can commit, and that his relationship with the victim facilitated the offense. The court considered Kirkland's prior convictions, including a firearm conviction, and prior incarceration and found consecutive terms were necessary to protect the public and not disproportionate to the seriousness of the conduct and the danger he poses to the public. This record does not clearly and convincingly fail to support the trial court's findings. We overrule the sixth assignment of error.

### Sentencing Hearing

{¶43} In his seventh assignment of error, Kirkland challenges the fairness of his sentencing hearing because the trial court referenced "the lowest circle of hell" during the hearing. Specifically, Kirkland argues that the court unconstitutionally expressed religious beliefs by stating "it's the lowest circle of hell for people to violate

and portray a felony.[1]  The worst of the worst."

**{¶44}**  The Ohio Supreme Court has acknowledged that "a sentencing judge's religious comments may violate an offender's due process rights when they reveal an 'explicit intrusion of personal religious principles as the basis of a sentencing decision.'"  *State v. Arnett*, 88 Ohio St.3d 208, 222 (2000), quoting *United States v. Bakker*, 925 F.2d 728, 741 (4th Cir. 1991).  In *Arnett*, the Court held that the trial court did not violate due process by referring to the Bible while contemplating an appropriate sentence and quoting a biblical passage.  *Id*. at 212.  The Court further held that a court's religious expression "does not violate the offender's right to due process, when the judge adheres to the sentencing procedures outlined in the Revised Code and when the judge's religious references do not impair the fundamental fairness of the sentencing proceeding."  *Id*.

**{¶45}**  Here, during the sentencing, the victim's wife, younger sister, niece, brother, and cousin addressed the court.  They expressed their profound sadness and pain, the betrayal they felt, and Kirkland's lack of remorse.  The court made the comment after hearing their statements and discussing the great harm, pain and sadness that Kirkland caused.  Kirkland does not contend that the court failed to properly consider the required sentencing factors, and the record reflects that the sentencing judge properly considered the principles and purposes of felony sentencing and the seriousness and recidivism factors.  Thus, the religious reference did not affect the fundamental fairness of the sentencing.  *See id*.

**{¶46}**  Accordingly, we overrule the seventh assignment of error.

### Postrelease Control

---

[1] The court may have said "betray a family."

**{¶47}** In the eighth assignment of error, Kirkland contends that the trial court erred by imposing a period of postrelease control for murder.

**{¶48}** At the sentencing hearing, the trial court stated, "There's no postrelease control." A few days later, the trial court conducted a second sentencing hearing, and notified Kirkland of his mandatory postrelease-control requirements. The sentencing entry reflected that the court imposed postrelease control on the murder conviction and the WUD conviction. The last paragraph of the sentencing entry stated that Kirkland was not subject to postrelease control "as this is a life sentence."

**{¶49}** Because the trial court correctly informed Kirkland that there would be no postrelease control for the murder conviction, we remand the matter to the trial court to correct the sentencing entry via nunc pro tunc entry to remove the imposition of postrelease control for the murder conviction.

**{¶50}** We overrule the eighth assignment of error.

## Conclusion

**{¶51}** Having overruled Kirkland's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed and cause remanded.

**NESTOR** and **MOORE, JJ.,** concur.